UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EXELTIS USA INC.,

        Plaintiff,

    v.

FIRST DATABANK, INC.,

        Defendant.

Case No. 17-cv-04810-HSG

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION, MOTION TO STRIKE, AND MOTION TO DISMISS**

Re: Dkt. Nos. 3, 26

Pending before the Court is Plaintiff Exeltis USA Inc.'s motion for a preliminary injunction, Dkt. No. 3, and Defendant First Databank Inc.'s related motion to strike and motion to dismiss, Dkt. No. 26. For the reasons detailed below, the Court **DENIES** Plaintiff's motion for a preliminary injunction, **DENIES** Defendant's motion to strike, and **DENIES** Defendant's motion to dismiss.

I. **BACKGROUND**

A. **Factual Background[1]**

At the heart of this case is a regulatory question about the prescription status of prenatal vitamins under federal law. Plaintiff manufactures and sells prenatal vitamins. *See* Dkt. No. 1 ¶¶ 3, 9 ("Compl."). According to Plaintiff, its products, which contain 1 mg of folic acid, are not available without a prescription and are labeled and sold "by prescription only." *Id.* ¶¶ 3, 40. Defendant publishes a database of information about pharmaceutical products, including

---

[1] The Court limits its review to the pleadings for purposes of the pending motion to dismiss. *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003) ("When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond. A court may, however, consider certain materials — documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice — without converting the motion to dismiss into a motion for summary judgment.").

1   Plaintiff's prenatal vitamins.  *Id.* ¶¶ 2, 10.  Medicaid and insurance providers ("payors") purchase

2   and use Defendant's database to make reimbursement decisions.  *Id.* ¶¶ 2, 10, 46–47.

3       Defendant announced in May 2017 that it was revising its coding for dietary supplements

4   and medical foods.  *See id.* ¶ 1; *see also* Dkt. No. 26-1, Ex. E.  Historically, the "class value" field

5   in Defendant's database signified whether *manufacturers* identified their products as prescription-

6   only.  Dkt. No. 26-1, Ex. B at 2368.  It used code "F" where "[p]roduct labeling indicates

7   prescription or physician supervision required for use" and code "O" where the "[p]roduct has no

8   labeling indicating dispensing limitations."  *Id.*  Then in 2016, following guidance by the Food

9   and Drug Administration ("FDA") that medical foods cannot be properly labeled "prescription

10  only," *see* Dkt. No. 26-1, Ex. A,[2] Defendant amended the "class value" field to "identif[y] a

11  product's prescription status" under *federal law*.  *See* Compl. ¶¶ 49–50; Dkt. No. 1-2, Ex. B at

12  379–80, 2506; Dkt. No. 26-1, Ex. C at 2504.  Under this revised field, code "F" signifies "[d]rugs

13  that are prohibited by federal law from being dispensed without a prescription" and code "O"

14  signifies "[p]roducts with no federal legal prescription requirement, including medical foods,

15  dietary supplements, non-prescription medical devices, and over-the-counter drugs."  Dkt. No. 1-

16  2, Ex. B at 379–80, 2506; Dkt. No. 26-1, Ex. C at 2504.  However, code "F" still explicitly

17  included "prenatal vitamins labeled as prescription."  Dkt. No. 26-1, Ex. C at 2504.  Now,

18  Defendant intends to remove the reference under "F" to prenatal vitamins and change its coding

19  for all dietary supplements and medical foods — including Plaintiff's prescription prenatal

20  vitamins — to "O."  Compl. ¶ 58; *see also* 26-1, Ex. D at 2529 & Ex. E.  Absent Court

21  intervention, these proposed changes are set to go into effect on February 28, 2018.  *See* Dkt. No.

22  53.

23      Plaintiff contends that Defendant's coding decision, categorizing all prenatal vitamins as

24  "O" instead of "F," is false and misleading.  Compl. ¶¶ 59, 79, 88, 99, 107, 115.  Relatedly,

25  because this coding is false, Plaintiff contends that Defendant's statements that its database is

26

27  _____

    [2] *See also* U.S. Food & Drug Ass'n, Frequently Asked Questions about Medical Foods;
    Second Edition (May 2016),

28  https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInform
    ation/UCM500094.pdf.

"robust, reliable, and [offers] effective medication decision support solution[s]" are also false. *See* Dkt. No. 3 at 18.  Plaintiff further urges that Defendant's new coding "will lead to widespread denial of Medicaid and insurance coverage for [prenatal vitamins]."  Compl. ¶ 4.  Plaintiff states that as a consequence, women will have more limited access to these vitamins, which help prevent serious birth defects such as anencephaly and spina bifida.  *Id.* ¶¶ 5–7, 15–16, 24–25, 67.  It may also "destroy" Plaintiff's business model, in which only 6% of its prenatal vitamins are paid for out-of-pocket.  *Id.* ¶¶ 8, 76.

Accordingly, Plaintiff brings claims against Defendant for violations of the Lanham Act, 15 U.S.C. § 1125(a)(1); California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*; as well as claims under California common law for intentional interference with prospective economic advantage and trade libel.  *See* Compl. ¶¶ 77–118.

**B.   Statutory Background**

Plaintiff's allegations implicate two statutory frameworks:  the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, and the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*  The Court briefly discusses both statutory frameworks as they inform the Court's subsequent analysis.

**i.   The FDCA**

The FDCA is generally designed to protect the health and safety of the public.  *See 62 Cases of Jam v. United States*, 340 U.S. 593, 596 (1951); 21 U.S.C. § 331 (prohibiting "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded").  As relevant to the products in this case, the FDCA identifies three broad categories of pharmaceutical products:  drugs, dietary supplements, and medical foods.

A "drug" includes, *inter alia*, "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease."  21 U.S.C. § 321(g)(1)(B).  A "dietary supplement" is "a product (other than tobacco) intended to supplement the diet" that contains one or more dietary ingredients, including a vitamin, mineral, herb or other botanical, or an amino acid, *id.*

3

United States District Court
Northern District of California

§ 321(ff)(1)(A)–(D), "is not represented for use as a conventional food or as a sole item of a meal or the diet," *id*. § 321(ff)(2)(B), and "is labeled as a dietary supplement," *id*. § 321(ff)(2)(C). A medical food is "a food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation." *Id.* § 360ee(b)(3). These distinctions are significant as the FDCA regulates drugs and non-drug products differently. In particular, only certain drugs require a prescription under the FDCA. *See id.* § 353(b).

The FDA underscored the limited scope of the prescription requirement in May 2016, when it issued guidance on medical foods. *See* Dkt. No. 26-1, Ex. A.[3] The FDA emphasized that medical foods — unlike drugs — do not require a prescription under federal law. *Id.*; *see also* 21 U.S.C. § 321(g). The agency cautioned that, as a consequence, medical foods may not bear labels with prescription-only language. *See* Dkt. No. 26-1, Ex. A at 8. Doing so, the guidance advised, would be false and misleading. *Id.*; *see also* 21 U.S.C. § 353(b)(4)(A)–(B). To date, the FDA has not issued similar guidance for dietary supplements.

### ii. The Medicaid Act

Medicaid is a joint federal-state program that provides healthcare benefits, including prescription drugs, for low-income Americans. *See* 42 U.S.C. §§ 1396 *et seq.* Medicaid recipients can obtain certain drugs from their healthcare providers, which are then reimbursed by state Medicaid programs, which are in turn partly reimbursed by the federal government. *See* 42 U.S.C. §§ 1396a, 1396b. Reimbursement under Medicaid is, in most circumstances, permitted only for "covered outpatient drugs." *See* 42 U.S.C. § 1396b(i)(10); *see also* § 1396r–8. All drugs approved as safe and effective "prescription drug[s]" by the FDA since 1962 qualify as "covered outpatient drugs." *See* 42 U.S.C. § 1396r–8(k)(2)(A); *see also* § 1396r–8(k)(4) (considering non-prescription drugs prescribed by physicians as "covered outpatient drugs" provided that state

---

[3] *See also* U.S. Food & Drug Ass'n, FREQUENTLY ASKED QUESTIONS ABOUT MEDICAL FOODS; SECOND EDITION (May 2016), https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/UCM500094.pdf.

Medicaid programs cover them).  Moreover, Medicaid has mandated since 1993 that all state Medicaid programs cover "prescription prenatal vitamins."  *See* 42 U.S.C. § 1396r-8(d)(2)(E) (states may exclude from coverage or otherwise restrict "[p]rescription vitamins and mineral products, *except prenatal vitamins . . . .*") (emphasis added); *see also* 81 Fed. Reg. 5170, 5188 (according to the Centers for Medicare & Medicaid Services "prescription prenatal vitamins and fluoride preparations would qualify as [covered outpatient drugs], which . . . states may not restrict or exclude from coverage); 107 Stat. 312, Pub. L. 103–66, § 13602 (1993) (adding Medicaid rebate program).

## II.   LEGAL STANDARD

### A.   Preliminary Injunction

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking preliminary injunctive relief must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.  Alternatively, an injunction may issue where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor," provided that the plaintiff can also demonstrate the other two *Winter* factors. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (quotation omitted).  Under either standard, Plaintiff bears the burden of making a clear showing that it is entitled to this extraordinary remedy. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).

### B.   Motion to Strike

Under California's anti-SLAPP statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. P. Code § 425.16.  The statute

United States District Court
Northern District of California

was enacted to curtail "strategic lawsuits against public participation," that were "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances." *Id.* § 425.16(a). Because "it is in the public interest to encourage continued participation in matters of public significance, and [because] this participation should not be chilled through abuse of the judicial process," the anti-SLAPP statute is to be construed broadly. *Id.*

California courts apply a two-step process for analyzing an anti-SLAPP motion. *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010). Under the first prong, the moving party must make "a threshold showing . . . that the act or acts of which the plaintiff complains were taken 'in furtherance of the right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute." *Equilon Enters., LLC v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (Cal. 2002) (quoting Cal. Civ. P. Code § 425.16(b)(1)). If the moving party meets its threshold showing, then the burden shifts to the non-moving party to prove a probability of prevailing on the claim. *See id.* at 67.[4]

### C. Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard

---

[4] Since 1999, the Ninth Circuit has determined that the motion to strike and attorneys' fees provisions of California's anti-SLAPP statute, Cal. Civ. P. Code § 425.16(b)–(c), are available in federal court because there is no "direct collision with the Federal Rules." *See U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972–73 (9th Cir. 1999) (quotation omitted). Yet a number of judges have questioned this holding. *See, e.g.*, *Travelers Cas. Ins. Co. of Am. v. Hirsh*, 831 F.3d 1179, 1182–86 (9th Cir. 2016) (Kozinski, J., concurring); *id.* at 1186 (Gould, J., concurring); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 274–75 (9th Cir. 2013) (Kozinski, J., concurring); *see also id.* at 275–76 (Paez, J., concurring); *In re Gawker Media LLC*, 571 B.R. 612, 628–32 (Bankr. S.D.N.Y. 2017); *cf. Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333–37 (D.C. Cir. 2015) (rejecting application of District of Columbia's anti-SLAPP statute in federal court). The Court applies the statute in this case as required by binding case law, but shares the concern that the Ninth Circuit's interpretation of the statute to date "vastly understates the disruption when federal courts apply the California anti-SLAPP statute," particularly as it interacts with Rule 12 and its plausibility standard. *See Makaeff*, 715 F.3d at 274 (Kozinski, J., concurring).

requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Id.* However, a plaintiff must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The Court does not credit allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).

## III. PRELIMINARY INJUNCTION

### A. Prior Restraint

As a threshold matter, Defendant contends that the requested preliminary injunction in this context would impose an unconstitutional prior restraint. "The term prior restraint is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quotation omitted). "Temporary restraining orders and permanent injunctions — *i.e.*, court orders that actually forbid speech activities — are classic examples of prior restraints." *Id.* The Supreme Court has advised that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Consequently, there is a "heavy presumption against [their] constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971). This presumption exists even when the party seeking the restraint alleges that the speech is false or will have harmful ramifications. *Id.* (denying injunction prohibiting publication of Pentagon Papers even in light of asserted threat to national security interests); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418–19 (1971) ("It is elementary, of course, that . . . the courts do not concern themselves with the truth or validity of the publication. . . . [T]he injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights.").

Yet the First Amendment offers fewer protections for commercial speech. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563 (1980). It remains an open

question in the Ninth Circuit whether there is an exception to the prior restraint doctrine for allegedly false commercial speech. *Hunt v. City of Los Angeles*, 638 F.3d 703, 718, n.7 (9th Cir. 2011); *cf. Sears, Roebuck & Co. v. F. T. C.*, 676 F.2d 385, 399 (9th Cir. 1982) ("[F]alse or deceptive commercial speech is entitled to no first amendment protection whatsoever."). Even assuming that Defendant's database is commercial speech, *see* Section III.B.i, the Court finds no persuasive justification for not applying the general presumption against prior restraints, where there has not yet been any determination on the merits that the speech is in fact false or misleading, and falsity is the key issue in dispute. To do so would risk erroneously enjoining truthful, protected speech on the basis of an incomplete record. *Cf. Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001) ("A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment."); *accord New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1084 (C.D. Cal. 2003) ("'[T]he danger of a prior restraint, as opposed to [an] ex post . . . action, is precisely that making predictions ex ante as to what restrictions on speech will ultimately be found permissible is hazardous and may chill protected speech.'") (quoting *Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 465 (2d Cir. 1999)). Although "commercial speech may be more durable than other kinds . . . [s]ince advertising is the Sine qua non of commercial profits," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 (1976), the speech at issue here is not advertising, but instead concerns third-party manufacturers' products, as discussed in Section III.B.i below.

Plaintiff's cases do not persuade the Court otherwise. *See* Dkt. No. 41 at 4. Most do not address the First Amendment or prior restraint doctrine at all. *See, e.g.*, *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124–33 (9th Cir. 2014); *United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1106 (9th Cir. 2000); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1159–62 (9th Cir. 1982); *cf. Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon are not to be considered as having been so decided as to constitute precedents."). Others turn on factual details not present in this case. *See, e.g.*, *Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 F. App'x 623, 626–27 (9th

Cir. 2017) (affirming district court's conclusion that prior restraint doctrine not at issue where party had signed nondisclosure agreement).

Other cases cited by Plaintiff discuss the constitutional implications of a preliminary injunction only briefly. *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.* merely cites *Central Hudson* for the general principle that false and misleading commercial speech has limited constitutional protection. 700 F. App'x 251, 264 (4th Cir. 2017). And *Vidal Sassoon, Inc. v. Bristol-Myers Co.* rejects the defendant's First Amendment argument in a footnote, citing *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir. 1979). *See Vidal Sassoon*, 661 F.2d 272, 276 & n.8 (2d Cir. 1981). In *Dallas Cowboys*, however, the court found that a pornographic movie that depicted "Texas cheerleaders" had a "barely discernable message" and the plaintiff's trademark, as a property right, "need not yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist." 604 F.2d at 206.

Plaintiff does not propose any "alternative avenue[] of communication" here, but rather requests a preliminary injunction to essentially freeze Defendant's database and prevent Defendant from "recoding prescription prenatal vitamins as 'over-the-counter' or 'O' in its widely used drug databases." Dkt. No. 3 at 25. Plaintiff also suggests that Defendant's decision to redefine "O" or the class value field itself would lead to irreparable harm and should be circumscribed. *See* Dkt. No. 41 at 7–8. The Court finds that the requested injunction would constitute a prior restraint on speech because it would order Defendant to refrain from speech — altering its own database — before there has been any trial or adjudication of the merits. Plaintiff has not met its "heavy burden" to justify a prior restraint in this context. *Cf. Near v. Minnesota*, 283 U.S. 697, 716 (1931) (identifying extraordinary circumstances that may warrant a prior restraint, such as the "actual obstruction to [the government's] recruiting service or the publication of the sailing dates of transports or the number or location of troops," or "incitements to acts of violence and the overthrow by force of orderly government").[5]

_____

[5] During the hearing on this motion, Plaintiff suggested that the application of the prior restraint doctrine in this context would hinder the government's regulatory enforcement efforts. *See* Dkt.

## B. Preliminary Injunction Factors

Even if a preliminary injunction would not constitute an unconstitutional prior restraint, the Court also concludes that a preliminary injunction would nevertheless be inappropriate under the traditional *Winter* factors. *See Winter*, 555 U.S. at 20.

### i. Likelihood of Success on the Merits

Plaintiff brings five causes of action against Defendant: violations of the Lanham Act; the UCL; and the FAL; as well as intentional interference with prospective economic advantage and trade libel claims. *See* Compl. ¶¶ 77–118. It is undisputed that the federal and state consumer protection statutes apply exclusively to commercial speech,[6] and that all of Plaintiff's causes of action require a showing that Defendant's database is either false or misleading.[7] The Court addresses these two elements in turn.

#### a. Commercial Speech

The Ninth Circuit has highlighted that federal law is not "clear" about "what type of speech qualifies as commercial speech." *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004). The Supreme Court has held that the "core notion of commercial speech" encompasses "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug*

---

No. 51 at 15:15–20. The Court need not address that issue here, because nothing in the record suggests that there has been any regulatory enforcement activity against Defendant in this case. That there may be a public interest in the database and in women's access to prenatal vitamins does not alter the fact that this is a private dispute between private parties. The Court, therefore, declines to address the scope of the government's interest in and the breadth of its power to "protect[] consumers from 'commercial harms.'" *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011) (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 (1993)).

[6] "California's consumer protection laws, like the unfair competition law, govern only commercial speech." *Rezec v. Sony Pictures Entm't, Inc.*, 116 Cal. App. 4th 135, 140 (Cal. Ct. App. 2004) (discussing UCL, FAL, and CLRA claims).

[7] "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Similarly, the UCL prohibits any "unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200, and the FAL prohibits any "unfair, deceptive, untrue, or misleading advertising," Cal. Bus. & Prof. Code § 17500. Plaintiff's intentional interference and trade libel claims also require a showing that Defendant published a false or misleading statement. *See J-M Mfg. Co., Inc. v. Phillips & Cohen LLP*, 247 Cal. App. 4th 87, 97 (Cal. Ct. App. 2016) ("[L]ibel requires a false statement of fact."); *cf. Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 944 (Cal. 2008) (noting that intentional interference requires an intentional and independently wrongful act).

*Prod. Corp.*, 463 U.S. 60, 66 (1983) (quotation omitted).  It has alternatively defined commercial

speech as "expression related solely to the economic interests of the speaker and its audience."

*Am. Beverage Ass'n v. City & Cty. of San Francisco*, 871 F.3d 884, 890 (9th Cir. 2017).  In any

event, courts are loath to identify a strict test.  *Cf. Discovery Network, Inc.*, 507 U.S. at 419

(acknowledging "the difficulty of drawing bright lines that will clearly cabin commercial speech

in a distinct category").

      Plaintiff cites the Supreme Court's opinion in *Bolger v. Youngs Drug Prod. Corp.*, and the

California Supreme Court's opinion in *Kasky v. Nike, Inc.*, to focus the Court's analysis on "the

speaker, the intended audience, and the content of the message."  *Kasky v. Nike, Inc.*, 27 Cal. 4th

939, 960 (2002), *as modified* (May 22, 2002); *see also Bolger*, 463 U.S. at 66–67 (considering the

advertising format and the speaker's economic motivation in its commercial speech analysis).

Plaintiff posits that under these factors, Defendant's database is commercial because it is available

for purchase and used by "commercial actors" to complete "commercial transactions" among

third-parties (*e.g.*, payors, pharmacies, and consumers).  *See* Dkt. No. 36 at 11–13.  The Court is

not persuaded.

      The Court questions Plaintiff's broad interpretation of what constitutes commercial speech.

As even the court in *Kasky* acknowledged, "[t]he United States Supreme Court has never decided

whether false statements about a [third-party's] product or service . . . would properly be

categorized as commercial speech," and the California Supreme Court declined to offer its own

opinion.  *Kasky*, 27 Cal. 4th at 962; *cf. Handsome Brook Farm*, 700 F. App'x at 264 (finding

commercial speech where defendant certified egg producers as "humane," received revenue for

eggs sold with its "certified humane" label, and sent email at issue to grocery stores considering

changing to an uncertified producer as their egg supplier).  Moreover, there is no ready limiting

principle under Plaintiff's proposal:  any speech could be commercial if eventually relied on by

third-party actors who conduct business.  A newspaper article, for example, could be considered

"commercial speech" simply because the newspaper company sells newspapers and third-parties

base decisions on information they read in the newspaper.  *See New York Times Co. v. Sullivan*,

376 U.S. 254, 266 (1964) ("That the Times was paid for publishing [an] advertisement is as

immaterial in this connection as is the fact that newspapers and books are sold.")  That a publisher compiles information, or even provides its own interpretation of that information, for commercial actors is not enough to transform it into commercial speech.  The Supreme Court has previously rejected such sweeping definitions.  *See id.*

As even Plaintiff must concede, Defendant's database is not a traditional advertisement, but rather a "drug compendia."  Dkt. No. 3 at 8.  According to the record before the Court, Defendant is not promoting any of the pharmaceutical products identified in its database, nor does it have a financial incentive in payors' reimbursement decisions, as it is not a party to those transactions and receives no compensation contingent on reimbursement.  The Court therefore finds that Plaintiff has not met its burden of establishing a likelihood of success on the merits on this point.

### b.  Falsity

The Court also questions Plaintiff's ability to establish that Defendant's statements are false under either of Plaintiff's two theories.

Plaintiff appears to eschew its original argument that Defendant's revisions would simplistically mislabel Plaintiff's products as "over-the-counter."  *Compare* Dkt. No. 3 at 1, 11–13, 18, *with* Dkt. No. 41 at 1, 7–8.  Instead, Plaintiff first argues that, regardless of any delineated definition, payors commonly understand the codes "F" and "O" to mean prescription and over-the-counter respectively.  Dkt. No. 41 at 8.  Plaintiff urges that the new definitions will consequently lead to confusion among payors.  *Id.*  Yet Plaintiff does not adequately account for the weight of Defendant's proffered evidence.  In particular, Defendant's revised definitions of "F" and "O" are not binary, signifying merely "prescription" or "over-the-counter."  Rather, "F" signifies "[d]rugs that are prohibited by federal law from being dispensed without a prescription" and "O" signifies "[p]roducts with no federal legal prescription requirement, including medical foods, dietary supplements, non-prescription medical devices, and over-the-counter drugs."  *See* Dkt. No. 26-1, Ex. D at 2529.

Although these definitions only appear on a single page of a lengthy document, the Court

is not persuaded that a payor would overlook this change.[8]  Though the change may be subtle, Defendant provided its subscribers with substantial notice.  *See* Dkt. No. 26-1, Ex. E.  In a letter to its subscribers dated May 15, 2017, Defendant highlighted its view that neither dietary supplements nor medical foods are drugs subject to the FDCA's prescription requirement.  *Id.* at 2.  As such, "the notion that [they] can be properly labeled as products for which a prescription is required is not tenable."  *Id.*  Defendant identified prenatal vitamins as "simply one form of dietary supplements" that do not require a prescription.  *Id.*  Yet it was careful to acknowledge that "the fact that there is no federal *requirement* for a prescription does not mean an item cannot be prescribed by a physician."  *Id.*  Accordingly, Defendant explained it would "provide supplemental descriptive attributes for [non-drug] products . . . to identify them as . . . 'Marketed as Prescription Prenatal Vitamin,' etc."  *Id.*  And as Defendant advised in the letter, its new "class value" field definition includes a text box, which notes that Defendant "provides additional information regarding labeler representations" in a separate table.  *See* Dkt. No. 26-1, Ex. D at 2529.

Falsity cannot be assessed by plucking terms out of context.  *See Ranbaxy Labs. Inc. v. First Databank, Inc.*, 826 F.3d 1334, 1336 (11th Cir. 2016) ("Reference to the documentation is necessary to understand the various fields of coded data, many of whose meaning is not self-evident.").  The Court finds that when all of Defendant's statements are considered in context, Plaintiff has not established a likelihood of success on this argument.

Plaintiff argues in the alternative that even if the "class value" field now refers to whether products are required by federal law to be dispensed by prescription and subscribers understand these definitions, its products are in fact subject to federal legal prescription requirements.  Dkt.

---

[8] Although not squarely before the Court, the Court also notes its concern that a practical consequence of Plaintiff's reliance argument is that Defendant could never alter its database.  Yet as Plaintiff acknowledged during oral argument, in general speakers may determine how to convey their message.  *See* Dkt. No. 51 at 20:17–19 ("[Defendant is] more than welcome and of course can change the definitions of their fields."); *cf. Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 11 (1986) ("[A]ll speech inherently involves choices of what to say and what to leave unsaid."); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995) (recognizing that in general a speaker is generally "free" to make its own "decisions concerning omissions or additions to the content of a publication.").

No. 41 at 8–9. Plaintiff points to the Medicaid Act as the relevant federal law, which requires state programs to cover "prescription prenatal vitamins." *See* 42 U.S.C. § 1396r-8(d)(2)(E) (states may exclude from coverage or otherwise restrict "[p]rescription vitamins and mineral products, except prenatal vitamins . . . ."). CMS has also commented that "prescription prenatal vitamins and fluoride preparations would qualify as [covered outpatient drugs], which . . . states may not restrict or exclude from coverage. *See also* 81 Fed. Reg. 5170, 5188. Yet on its face the Medicaid Act only mandates states to cover "prescription prenatal vitamins." It does not define "prescription prenatal vitamins," nor does it mandate which products actually require a prescription. To the contrary, the Medicaid Act's definition of "covered outpatient drugs" generally turns on the FDA's determination of approved "prescription drugs" under the FDCA. *See* 42 U.S.C. § 1396r–8(k)(2)(A). Plaintiff does not allege whether its prenatal vitamins are drugs or dietary supplements for purposes of the FDCA, but only certain drugs require a prescription under the FDCA. *See* 21 U.S.C.A. § 353(b). Plaintiff may seek approval of its products as new drugs, which would then necessitate a prescription, but Plaintiff has not provided any evidence that it has done so.

Nevertheless, in an attempt to define the FDA's position on prenatal vitamins, Plaintiff cites a letter that the FDA sent to Defendant in June 2017 regarding Defendant's coding changes for medical foods. The FDA writes that it "has been made aware of patients who are losing or have lost insurance coverage for their products marketed as medical foods" because "insurance providers belie[ve] that the products are over-the-counter (OTC) drugs." Dkt. No. 3-16, Ex. O. This letter says nothing about the prescription requirements for prenatal vitamins. The parties do not suggest that prenatal vitamins are medical foods. And even if they were, the FDA clearly states throughout the letter that the FDA "does not require [medical foods] to be dispensed by prescription" because they "are not drugs." *Id.*

The Court acknowledges the apparent disconnect between CMS and the FDA, as neither agency appears to make any attempt to harmonize coverage under the Medicaid Act with the FDA's prescription requirements. If "prescription prenatal vitamins" must be covered by state programs, it follows that some category of prenatal vitamins are properly available by

14

prescription. Nevertheless, Plaintiff has not pointed to a federal law that *requires* its products to be dispensed by prescription only. The Court finds that Plaintiff has not met its burden of showing a likelihood of succeeding on its claims. That Plaintiff would prefer Defendant to organize its information or code Plaintiff's products differently does not render the database false or misleading.

Because of the deficiencies identified in Plaintiff's commercial speech and falsity arguments, the Court finds that Plaintiff has not established a likelihood of success on the merits of its claims.

### ii. Irreparable Harm

The Court also finds that Exeltis will not suffer irreparable harm absent a preliminary injunction. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Rather than focus on its own injury, Plaintiff attempts to redirect the focus of the irreparable harm inquiry to third parties. This is not permissible. "A plaintiff seeking a preliminary injunction must establish . . . that *he is* likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (emphasis added). Women's access to affordable prenatal vitamins has a place in the preliminary injunction analysis, but not under the irreparable harm prong. *See* Section III.B.iii. *But see Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 711 (2d Cir. 1982) (considering third-party harm as part of equities analysis because "[the Second Circuit's] settled preliminary injunction standard does not explicitly mention the public interest").

Plaintiff's cases analyzing irreparable harm based on third-party harm are readily distinguishable. In *Hawaii v. Trump*, the Ninth Circuit analyzed the scope of the President's power to control immigration and the district court's order enjoining parts of Executive Order 13780. 859 F.3d 741 (9th Cir.), *cert. granted, judgment vacated sub nom. Trump v. Int'l Refugee Assistance Project*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017), and *vacated*, 874 F.3d 1112 (9th Cir. 2017). In doing so, the state plaintiffs identified their own proprietary injuries as the basis for irreparable harm, including the state's limited ability "to recruit[]and attract[] students and faculty members to the University of Hawaii," the state's "decreased tuition revenue," and

"the [s]tate's inability to assist in refugee resettlement." *Id.* at 765, n.6, 782–83. In *Women's Med. Prof'l Corp. v. Voinovich*, the district court considered harm to a doctor's patients because of "the close relationship between [the doctor] and his patients, and given the obstacles which prevent pregnant women from challenging [a state ban on certain abortion procedures]." 911 F. Supp. 1051, 1058, 1092 (S.D. Ohio 1995), *aff'd*, 130 F.3d 187 (6th Cir. 1997). Plaintiff has not identified any comparable relationship here. To the contrary, the evidence Plaintiff proffers indicates that Plaintiff markets exclusively to physicians, who then make the requisite prescribing decisions for their patients. *See* Dkt. No. 3-4, Ex. C ¶ 7. Plaintiff's other cases merely discuss third-party standing under Article III of the Constitution and do not address preliminary injunctions at all. *See* Dkt. No. 3 at 21, n.12.

The only direct harm that Plaintiff identifies to the company is "financial loss[es]" and an "accompanying loss of goodwill." *See* Dkt. No. 3 at 14–15. Although Plaintiff describes the loss of goodwill broadly as harm to the company's "reputation for quality and its relationships with business partners," when pushed to elaborate on what this means, Plaintiff states that "pharmacists will stop stocking, doctors will stop prescribing, and patients will stop using [Plaintiff's] products." Dkt. No. 41 at 13. In other words, Plaintiff's "goodwill" injury is, in effect, a lost revenue proxy. In general, "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). To the extent Plaintiff also suggests it will lose some competitive advantage, the changes to the database will affect all prenatal vitamin supplement manufacturers, and nothing in the database or federal law prevents physicians from continuing to prescribe Plaintiff's product. *Cf. Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411–12 (9th Cir. 2015) (finding irreparable harm based on competitive disadvantage where ordinance would impose higher minimum wage for franchisees over non-franchisees).

Even if the Court were to conclude that such injury is not easily measured by monetary damages, the Court still finds it speculative. *See*, *e.g.*, *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a

16

clear showing that the plaintiff is entitled to such relief.").  Plaintiff's claimed injury turns on the following chain of events:  based on Defendant's revised database, payors will no longer reimburse for Plaintiff's prenatal vitamins; because payors will not reimburse for Plaintiff's products, physicians will stop prescribing them and will instead prescribe other, covered prenatal vitamins; and consumers will no longer take Plaintiff's products and may not find a suitable alternative.  In short, the harm Plaintiff identifies turns on independent decisions made by several third-parties.

Plaintiff's evidence cannot overcome this attenuation problem.  Critically, Plaintiff's sales director and two experts simply assume, without sufficient explanation, that following the changes to the database, payors will no longer cover Plaintiff's products.  *See generally* Dkt. No. 3-2, Ex. A; *see also* Dkt. No. 3-3, Ex. B ¶¶ 25–28, 33–34; Dkt. No. 3-4, Ex. C ¶¶ 14–16.  They do not address the revised definitions of the "class value" field and of "F" and "O" respectively, nor do they account for the additional table and data field, which would describe whether a product is "designated as prescription" and is "designated as a prenatal dietary supplement."  *See id.*; *see also* Compl. ¶ 58; *see also* 26-1, Ex. D at 2529 & Ex. E.  As Plaintiff's own expert explains, "the *payor* must determine if the drug is covered and how much the pharmacy will be reimbursed."  Dkt. No. 3-3, Ex. B ¶¶ 1–2, 21, 24 (emphasis added).  Payors use these databases to "determine whether [a] drug is covered under the *payor's* coverage policies."  *Id.* ¶ 23 (emphasis added).  There is no reason in the record for the Court to conclude that payors would abdicate their responsibility to determine which products to reimburse, or that Defendant should be held accountable if they do so.  To the extent that Plaintiff's expert cautions that payors would need time to change their claims processing systems to account for Defendant's proposed changes, *see id.* ¶¶ 44–45, Defendant provided notice to its database subscribers of its interpretation of federal law and the resulting changes to its database in May 2017, Compl. ¶ 1; *see also* Dkt. No. 26-1, Ex. E.  There is simply no evidence in the record to suggest that this notice or timeframe is insufficient.

### iii.    Balance of Equities

As suggested in its discussion of prior restraints and irreparable injury, the Court finds that the balance of equities favors Defendant.  Defendant's First Amendment rights will be curtailed if

17

it is restricted in its ability to alter its own database and inform its subscribers about its understanding of the prescription status of certain products. On the other hand, the financial hardship suffered by Plaintiff is compensable though money damages after a final determination at trial, and its asserted harm is far more attenuated than Defendant's.

### iv. Public Interest

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009). "If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id.*

Plaintiff emphasizes the public health consequences that could follow if payors no longer reimburse for prenatal vitamins. *See* Dkt. No. 3 at 23–24. Both parties appear to agree that prenatal vitamins — and folic acid more specifically — provide key health benefits, such as drastically reducing the risk of birth defects. *See* Dkt. No. 3 at 3–5; Dkt. No 26 at 4–5. The Court does not minimize the vital importance of ensuring that women have access to adequate and affordable prenatal healthcare. Yet the Court does not have unfettered discretion, even when considering the equities and public interest for purposes of a preliminary injunction; instead, it is constrained by the facts of the case to determine "the likely consequences of the injunction." *Stormans*, 586 F.3d at 1139. Such consequences, to be properly considered, "must not be too remote, insubstantial, or speculative and must be supported by evidence." *Id.*

As touched on above, the Court finds that Plaintiff has failed to establish more than a speculative possibility, rather than a likelihood, that women will be denied access to prenatal vitamins absent an injunction. Plaintiff relies on several unsupported assumptions about the conduct of third parties. In particular, Plaintiff assumes that payors will abandon their independent obligations to determine which products they must cover under federal law. Although the Court has highlighted a potential ambiguity in the relevant law, *see* Section III.B.i.b, this order does not purport to exonerate payors who actually fail to comply with federal law.

Assuming payors misinterpret federal law and erroneously deny coverage for prenatal vitamins, the wrongful conduct lies with the payors, and not with Defendant. Yet an injunction against Defendant would not control payors' reimbursement decisions. Because the denial of access to prenatal vitamins is so far removed from Defendant's actual speech, and because of the limited reach of an injunction in this case, the Court finds that the public interest does not offset the significant and immediate harm that a preliminary injunction would cause by silencing Defendant's speech. *See* Section III.B.

*     *     *

Accordingly, Plaintiff's motion for a preliminary injunction is **DENIED**.

## IV.    MOTION TO STRIKE

Defendant, in turn, seeks to strike Plaintiff's California state law claims under California Code of Civil Procedure § 425.16. *See Thomas v. Fry's Elecs., Inc.*, 400 F.3d 1206, 1206–07 (9th Cir. 2005) (finding that the anti-SLAPP statute is available to litigants in federal court).

### A.    Matter of Public Interest

To be subject to an anti-SLAPP motion, the cause of action must arise from an act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Civ. P. Code § 425.16(b). The statute "shall be construed broadly" to safeguard "the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." Cal. Civ. P. Code § 425.16(a).

Covered acts include, but are not limited to, "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" or "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public concern." Cal. Civ. P. Code § 425.16(e)(3)–(e)(4). Speech is considered "in connection with an issue of public interest" if it concerns: (1) "a person or entity" in the public eye; (2) "conduct that could directly affect a large number of people beyond the direct participants"; or (3) "a topic of widespread, public interest." *Rivero v. Am. Fed'n of State, Cnty., and Mun. Employees, AFL–CIO*, 105 Cal. App. 4th 913, 924 (Cal. Ct. App. 2003).

Defendant's database describes a broad array of information about pharmaceutical products, and, as Plaintiff concedes, it is used by "[m]ost state Medicaid programs and private insurers" to make reimbursement determinations for consumers. Dkt. No. 36 at 3; *see also* Compl. ¶¶ 2, 69–73. Nevertheless, Plaintiff contends that the database cannot constitute a matter of public interest because it is only available to paying subscribers who utilize "sophisticated computer algorithms." Dkt. No. 36 at 20. Because the information is not freely available to the public, consumers, or policymakers, Plaintiff suggests that the information is not a matter of public interest. *Id.* at 20–21. During the hearing on this motion, Plaintiff acknowledged that there are no limitations on who may subscribe to the database. *See* Dkt. No. 51 at 6:14–7:9. Still, it urged that the database is only available to paying subscribers and as a practical matter, is only used by payors. *Id.*

Although Plaintiff appears to conflate public interest issues with public forum issues, even speech that is only available to select and limited groups may be protected by the anti-SLAPP statute. *See Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 476–477 (Cal. Ct. App. 2000) (finding a newsletter published to 3,000 members of homeowners' association a public forum). The fact that people must subscribe or pay to have access to the information is also not preclusive. *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1037–38 (Cal. Ct. App. 2008) (noting that "a newspaper or magazine need not be an open forum to be a public forum — it is enough that it can be purchased and read by members of the public."). However, where an issue is "not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community)," the anti-SLAPP statute protects activity that occurs "in the context of an ongoing controversy, dispute or discussion." *Du Charme v. Inter. Broth. of Elec. Workers, Local 45*, 110 Cal. App. 4th 107, 119 (Cal. Ct. App. 2003).

Plaintiff's own evidence highlights the context of Defendant's speech and its connection to a matter of public interest. Plaintiff cites a newspaper article which describes Defendant's role in reimbursement decisions as well as letters from members of Congress to CMS specifically regarding Defendant's proposed coding changes for prenatal vitamins. *See* Dkt. Nos. 36-2; 36-3; 36-4. Plaintiff's argument fares no better if the Court limits its analysis to payors. Plaintiff

20

alleges that, at least according to Defendant, First Databank is "the industry's most widely used, integrated drug database" and is "involved in 1.88 billion retail pharmacy prescriptions and 3.26 billion prescription claims annually." Compl. ¶ 73. Moreover, "eight of the top nine pharmacy benefit managers" use Defendant's database, as do 43 state Medicaid programs. *Id.* And as both parties make clear, there is an "ongoing discussion" about the prescription status of prenatal vitamins. *See, e.g.*, Dkt. No. 26-1, Ex. E at 1 (noting "questions from customers" and Defendant's year-long review). In the absence of clear directives from either the FDA or CMS, Defendant weighed in to express its interpretation of the "inconsistent if not conflicting" legal landscape. *Id.* The Court accordingly finds that the speech at issue in this case concerns a topic of widespread, public interest. *Cf. Rivera v. First DataBank, Inc.*, 187 Cal. App. 4th 709, 716–17 (Cal. Ct. App. 2010) (finding drug information was a matter of public interest because "[t]reatment for depression" and "matters of health . . . are undeniably of interest to the public.").

### B.    Commercial Speech Exception

Plaintiff contends that, as commercial speech, Defendant's database is not subject to anti-SLAPP protections in any event. The commercial speech exception to the anti-SLAPP statute is, however, a narrow one.

The anti-SLAPP statute "does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services" if: (1) the speech "consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services"; and (2) the "intended audience is an actual buyer or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual buyer or customer . . . ." *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 26 (Cal. 2010) (citing Cal. Civ. P. Code § 425.17(c)). The party asserting this exception bears the burden of proving its applicability. *Id.*

Plaintiff does not suggest that Defendant's database "consist[s] of representations" about Defendant's own products or those of a competitor. Nor does it explain how it relates to

21

Defendant's own sales. Instead, the speech at issue is about third-party manufacturers' products and is contained in the database itself, not made in the course of selling or delivering Defendant's product (*i.e.*, the database). *Accord Rivera*, 187 Cal. App. 4th at 718; *New.Net*, 356 F. Supp. 2d at 1104. The Court finds that Plaintiff has not met its burden of proving the commercial speech exception bars application of the anti-SLAPP statute to its state law claims.

### C. Probability of Success

Although for purposes of the preliminary injunction analysis the Court found that Plaintiff has not established a likelihood of success on the merits, the standard for evaluating the strength of Plaintiff's case is more lenient under the anti-SLAPP statute. To justify a preliminary injunction, Plaintiff has to demonstrate a "strong likelihood of success on the merits." *Johnson v. Cal. State Bd. of Accountancy*, 72 F. 1427, 1430 (9th Cir. 1995). But to survive an anti-SLAPP motion, Plaintiff only has to "show a reasonable probability of prevailing on its claims." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) (quotation omitted). "Reasonable probability" in this context means "only a minimum level of legal sufficiency and triability." *Id.* (quotation omitted). Significantly, "the trial court does not weigh the evidence or determine questions of credibility; instead the court accepts as true all of the evidence favorable to the plaintiff." *Nagel v. Twin Labs., Inc.*, 109 Cal. App. 4th 39 (2003); *see also* Cal. Civ. P. Code § 425.16(b)(2). The Court finds that, under this more lenient standard, Plaintiff has established that its claims have the necessary "minimal merit" to survive a motion to strike. *Navellier v. Sletten*, 29 Cal. 4th 82 (Cal. 2002).

As the parties point out and as already discussed above, Plaintiff's claims turn on the commercial nature of the database as well as the falsity of the proposed coding changes. According to Plaintiff, Defendant's database is not simply utilized as a factor in payors' reimbursement decisions, but is in fact the linchpin of these determinations. *See* Compl. ¶¶ 2, 46–51, 67–69. In support of this argument, Plaintiff identifies an expert, a former California Chief Medicaid Pharmacist, who explains that the database is at "the heart of every pharmacist claims processing system." Dkt. No. 3-3, Ex. B ¶ 22. In his role with the Department of Health Care Services, Plaintiff's expert "was responsible for setting and implementing California's Medicaid

(Medi-Cal) reimbursement policy and rebate contracting." *Id.* ¶ 2. And he explains that reimbursement decisions are determined "instantly" based on information from databases like Defendant's. *Id.* ¶¶ 21–23. He further suggests that this is by design, and the databases market themselves to enter and facilitate reimbursement transactions between third-parties. *Id.* ¶¶ 22–23. Although the Court has concerns about expanding the commercial speech doctrine, its application is fact dependent, and payors' actual use of the database and the database's primacy in actually effectuating reimbursement decisions may suggest that the database is commercial in nature. Accepting Plaintiff's evidence as true, the Court cannot conclude that there is no reasonable probability (as defined by the applicable lenient standard described above) of succeeding on this argument.

Similarly, the Court finds that Plaintiff has raised a legally sufficient argument that Defendant's new coding is false or misleading. As currently formulated, Defendant's database explicitly includes "prenatal vitamins labeled as prescription" under its "F" coding description:

> Drugs that are prohibited by federal law from being dispensed without a prescription; bulk drug ingredients for compounding; *prenatal vitamins labeled as prescription*; or prescription medical devices.

*See* Dkt. No. 26-1, Ex. C at 2504 (emphasis added). Defendant's proposed revision is subtle, maintaining the current description almost entirely, but omitting "prenatal vitamins labeled as prescription" from the end. As amended, it would read: "Drugs that are prohibited by federal law from being dispensed without a prescription." *See* Dkt. No. 26-1, Ex. D at 2504. Even assuming a reasonable payor would review these definitions in detail, the documentation does not highlight the change on its face. It refers to a new table with "labeler representations for dietary supplement and medical food products," but says nothing about prenatal vitamins or the latent ambiguity in their prescription status. *Id.* The only reference to the change in the record that is before the Court is the May 2016 letter to subscribers. *See* Dkt. No. 26-1, Ex. E. Although the letter details Defendant's legal research, the Court cannot say that this stage that no reasonable factfinder could conclude from the legal morass described in the letter that the database misleads payors into concluding that Plaintiff's products are available over-the-counter and that payors should withhold

23

coverage on this basis. *See also* Dkt. No. 3-3 ¶¶ 34–35.

To the extent that Defendant believes Plaintiff must supply even more evidence than it has, the Court disagrees and declines to grant the motion to strike at this early stage in the litigation. As the Ninth Circuit has cautioned, discovery is "require[ed]" where "the nonmoving party has not had the opportunity to discover information that is essential to its opposition." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001). The Court finds that, in particular, discovery may be necessary to obtain further information about payors' use of Defendant's database, Defendant's role in the related reimbursement transactions, payors' awareness of Defendant's proposed changes, and Defendant's own awareness of the above issues.

The Court takes the opportunity to repeat its concern about the tension between the anti-SLAPP statute and the Federal Rules of Civil Procedure. Even after *Metabolife*, at the very outset of a case, the anti-SLAPP statute places "the burden on the plaintiffs to show that they have not merely a triable issue of fact, but a reasonable probability of success . . . ." *Makaeff*, 715 F.3d at 275 (Kozinski, J., concurring). In any event, applying the anti-SLAPP statute as it must, the Court still finds that this is not the kind of obviously meritless or harassing case that the anti-SLAPP statute was designed to discourage. *See Metabolife*, 264 F.3d at 837, n.7 ("The purpose of the statute is to protect individuals from meritless, harassing lawsuits whose purpose is to chill protected expression."); *see also* Cal. Civ. P. Code § 425.16.

\*     \*     \*

The Court finds that Plaintiff's case has the minimal merit necessary to survive a motion to strike. The motion is **DENIED**.

## V. MOTION TO DISMISS

Defendant also seeks to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for reasons similar to those discussed in the motion for preliminary injunction and motion to strike: namely, the database is not commercial speech and Plaintiff has not established the falsity of its revised coding. The analysis, therefore, overlaps. Yet the plausibility standard that applies to a motion to dismiss is even lower than the probability standard that applies to an anti-SLAPP motion. *See Hilton*, 599 F.3d at 901–02. The key inquiry is simply whether, taken as

true, the pleadings state a claim for relief. For the reasons already discussed above, *see* Section IV.C, the Court finds that Plaintiff has met its burden under Rule 12(b)(6). Defendant's motion to dismiss is, therefore, **DENIED**.

## VI. CONCLUSION

Accordingly, the Court **DENIES** Plaintiff's motion for a preliminary injunction. A case management conference is **SET** for January 10, 2018 at 10:00 a.m. The parties are directed to meet and confer and submit a joint case management conference statement by January 3, 2018.

**IT IS SO ORDERED.**

Dated: 12/21/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge