UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXELTIS USA INC.,<br><br>    Plaintiff,<br><br>v.<br><br>FIRST DATABANK, INC.,<br><br>    Defendant. | Case No. 17-cv-04810-HSG<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 168, 209 |

Pending before the Court is Defendant First Databank, Inc.'s motion for summary judgment. *See* Dkt. No. 168.[1] The Court heard argument on this motion. For the reasons detailed below, the Court **GRANTS** the motion.

I. BACKGROUND

    A.    **Factual Background**

The parties are familiar with the largely undisputed facts of this case, and the Court only briefly summarizes them here as relevant to the pending motion for summary judgment. Plaintiff Exeltis USA Inc., a prenatal vitamin manufacturer, filed this action on August 17, 2017, against Defendant, challenging the new coding system that Defendant intended to implement for Plaintiff's products in its pharmaceutical database called "MedKnowledge." *See* Dkt. No. 160 ("FAC"). According to Plaintiff, Defendant's database is used by "payors," including pharmacy benefit managers ("PBMs") and Medicaid and private insurance providers to determine whether products are covered by public and private insurance plans. *See id.* at ¶¶ 1, 16, 53–58, 62–64; *see*

---

[1] Defendant initially filed its motion for summary judgment provisionally under seal, Dkt. No. 168, and later filed an unredacted version of the same motion after the Court denied the motion to seal, Dkt. No. 209.

*also* Dkt. No. 180-8, Ex. 15; Dkt. No. 179-10, Ex. 16 ("Lettrich Depo.") at 16:6–23:24; *See* Dkt. No. 172 ("Lupinetti Decl.") at ¶¶ 3–4.

Defendant offers payors licenses to the MedKnowledge database, which includes numerous fields, including clinical, descriptive, and pricing data about tens of thousands of pharmaceutical products. *See* Lupinetti Decl. at ¶¶ 2, 4, 9. Payors may use the database as part of their system to adjudicate claims and determine, based on the rules that the payors establish, whether to reimburse for specific products. *See* Lettrich Depo. at 16:6–21:24. Historically, the "class value" field in the MedKnowledge database indicated whether manufacturers identified their products as prescription-only. *See* Lupinetti Decl. at ¶¶ 9–10; *see also* Dkt. No. 179-2, Ex. 18 at 29. Code "F" identified product labels that indicated prescription or physician supervision was required, including prescription prenatal vitamins, and "O" identified when the product label did not contain any dispensing limitations. *See* Dkt. No. 172-1, Ex. A.

In May 2017, Defendant announced that it would revise its coding system. *See* Dkt. No. 172-4, Ex. D; Dkt. No. 172-5, Ex. E. Defendant proposed adjusting the class value field to identify whether federal law requires a prescription. *See id.* Under this revamped class value field, code "O" would signify "[p]roducts with no federal legal prescription requirement." *Id.* Under this new system, prescription prenatal vitamins would receive an "O" value. *See* Dkt. No. 172-5, Ex. E. Then in September 2018, Defendant announced a new plan: the creation of a new class value, "Q," which would include all prenatal vitamins (both prescription and over-the-counter). *See* Dkt. No. 180-12, Ex. 38, at Ex. A at 3–4. Under this plan, class values "O" and "F" would be limited to drugs and medical devices as specified below:

> F – Prescription drugs or medical devices as defined in the Food Drug and Cosmetic Act (FDCA), including bulk drug ingredients
> O – Non-prescription drugs or medical devices
> Q – Products that are neither drugs nor devices, such as dietary supplements (including prenatal and other vitamins), medical foods, herbal preparations, and bulk flavorings or colorants.

*See id.* at 4.

Plaintiff alleges that these coding changes would falsely characterize its prenatal vitamins as over-the-counter and mislead users of the database. *See* FAC at ¶¶ 93–109. Plaintiff further

2

urges that Defendant's new coding "will cause patients to lose coverage for prescription prenatal vitamins," which are critical to preventing birth defects. *Id.* at ¶¶ 111–16. Plaintiff asserts that by October 14, 2019, Defendant implemented the coding change as to most of Plaintiff's prescription prenatal vitamins—and many sold by other companies—in Defendant's database. *See* Dkt. No. 196 at ¶ 4. Based on these allegations, Plaintiff brings five causes of action against Defendant for (1) violating 15 U.S.C. § 1125(a)(1) of the Lanham Act; (2) violating California's Unfair Competition Law prohibiting "unlawful, unfair, [and] fraudulent" conduct; (3) false advertising under Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (4) intentional interference with prospective economic advantage; and (5) trade libel. *See* FAC at ¶¶ 117–160.

### B. Procedural History

On December 21, 2017, the Court denied Plaintiff's motion for a preliminary injunction, denied Defendant's motion to strike the state law claims under California's anti-SLAPP statute, and denied Defendant's motion to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 57. Defendant appealed the Court's denial of its special motion to strike on January 2, 2018. *See* Dkt. No. 58 (No. 18-15001). On October 4, 2019, the Ninth Circuit issued a memorandum disposition holding that Plaintiff's filing of an amended complaint mooted the appeal of the anti-SLAPP denial. *See Exeltis v. First Databank*, No. 18-15001, Dkt. No. 62 (9th Cir. Oct. 4, 2019). Following months of discovery, Defendant now moves for summary judgment. *See* Dkt. No. 168.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence

1  or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997),
2  *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court
3  finds that there is no genuine dispute of material fact as to only a single claim or defense or as to
4  part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

**III.  DISCUSSION**

Defendant has moved for summary judgment as to all of Plaintiff's claims. *See* Dkt. No. 168. *First*, Defendant challenges Plaintiff's Lanham Act, false advertising, and unfair competition law claims. Defendant contends that its database is not commercial speech and that Plaintiff cannot raise a genuine dispute as to whether its speech—reclassifying Plaintiff's prenatal vitamins as "[p]roducts that are neither drugs nor devices" under Class "Q"—could be found false or misleading. *See* Dkt. No. 168 at 12–31. *Second*, Defendant challenges Plaintiff's intentional interference and trade libel claims, arguing that there is no evidence of actual malice. *See id.* at 33–35.

**A.  Lanham Act, False Advertising, and Unfair Competition Claims**

   **i.  The Database Is Not Commercial Speech**

Much as they did at the preliminary injunction stage in this case, the parties dispute whether the MedKnowledge database constitutes commercial speech. Plaintiff can only succeed on its Lanham Act and state law claims for violations of the FAL and UCL if Defendant's database is commercial speech.[2] Defendant urges that it is undisputed that it "has no economic motivation whatsoever to publish an 'O' or 'Q' for Exeltis's products." *See* Dkt. No. 168 at 12. In response, Plaintiff contends that the database is integral to commercial transactions by which

---

[2] "The Lanham Act prohibits any person from misrepresenting her or another person's goods or services in 'commercial advertising or promotion.'" *See Ariix, LLC v. NutriSearch Corp.*, No. 19-55343, 2021 WL 221878, at *4 (9th Cir. Jan. 22, 2021) (citing 15 U.S.C. § 1125(a)(1)(B)). Commercial advertising or promotion, in turn, is defined as: "(1) *commercial speech*, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public." *Id.* (emphasis added) (citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)). Courts have also clarified that "California's consumer protection laws, like the unfair competition law, govern only commercial speech." *Rezec v. Sony Pictures Entm't, Inc.*, 116 Cal. App. 4th 135, 140 (Cal. Ct. App. 2004); *see also Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 953–56, 962 (Cal. 2002), *as modified* (May 22, 2002).

4

1  payors determine whether to reimburse for specific products under their respective insurance
2  plans.  *See* Dkt. No. 180 at 28–31.
3     As this Court has previously explained, the law is not "clear" about "what type of speech
4  qualifies as commercial speech."  *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004); *cf.*
5  *Kasky*, 27 Cal. 4th at 956–60, 969 (applying Supreme Court precedent and declining to articulate a
6  separate test for distinguishing commercial and noncommercial speech under the California
7  Constitution).  Although the Supreme Court has held that the "core notion of commercial speech"
8  encompasses "speech which does no more than propose a commercial transaction," *see Bolger v.*
9  *Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (quotation omitted), courts have been reluctant
10 to articulate a bright-line rule to identify commercial speech that falls outside this "core" zone.  *Cf.*
11 *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993) (acknowledging "the
12 difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct
13 category"); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557,
14 579 (1980) (Stevens, J., concurring) (cautioning that commercial speech should "not be defined
15 too broadly lest speech deserving of greater constitutional protection be inadvertently
16 suppressed").  Rather, the "commercial speech analysis is fact-driven," and courts "try to give
17 effect to a common-sense distinction between commercial speech and other varieties of speech."
18 *See Ariix,* 2021 WL 221878, at *5 (quotations omitted).  "Where the facts present a close
19 question," the Supreme Court has identified three non-exhaustive factors for courts to consider as
20 part of the commercial speech analysis:  (1) whether the speech is an advertisement; (2) whether
21 the speech refers to a particular product; and (3) whether the speaker has an economic motivation
22 for publication.  *See Ariix*, 2021 WL 221878, at *5 (citing *Bolger*, 463 U.S. at 66–68); *see also*
23 *Kasky*, 27 Cal. 4th at 969 (applying the same three-factor test under *Bolger*).
24     Plaintiff acknowledges that to the extent the database is commercial speech, it falls outside
25 the "core" commercial speech zone.  *See* Dkt. No. 205 ("Hearing Tr.") at 35:21–37:8.
26 Defendant's database provides information about third-party pharmaceutical products (including
27 Plaintiff's prenatal vitamins), not its own products.  Other third parties then use this information as
28 part of their claims adjudication systems to determine whether to reimburse for these

pharmaceutical products. "The United States Supreme Court has never decided whether false statements about a [third party's] product or service . . . would properly be categorized as commercial speech." *See Kasky*, 27 Cal. 4th at 962. Still, in denying Defendant's motion to strike, the Court left open the possibility that Plaintiff might be able to establish that the database was commercial speech, reasoning that "payors' actual use of the database and the database's primacy in actually effectuating reimbursement decisions may suggest that the database is commercial in nature." *See* Dkt. No. 57 at 23. Now, after the parties conducted extensive discovery, Plaintiff contends that the database should be considered commercial speech because it operates as a "payment screen" that is "used to consummate a commercial transaction" in payors' claims adjudication systems. *See* Hearing Tr. at 36:24–37:8.

Plaintiff does not address the three *Bolger* factors directly. As to the first, however, there can be little dispute that the database is not in the form of a traditional advertisement. *See* Hearing Tr. at 32:5–7. Although the database provides information about thousands of pharmaceutical products, it is not directed, or even generally available, to the individuals who may ultimately purchase these products (*i.e.*, patients or healthcare providers). Plaintiff suggests that the database is nevertheless commercial because it provides a service to payors, who rely on the information it contains. *See* Dkt. No. 180 at 24–25. Such an argument, however, proves too much. Under this interpretation, a phone book could be considered commercial speech because it too provides a service—the collection of residential, business, and consumer information—on which readers may rely for their own commercial ends. The Ninth Circuit, however, has held that phone books are noncommercial speech. *See Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012); *cf. Ariix*, 2021 WL 221878, at *6 (noting that a guidebook which rated nutritional supplements was not a traditional advertisement).

As to the second *Bolger* factor, the database clearly references thousands of specific products. Yet the Ninth Circuit has explained that this factor may "not shed much light" on whether speech is commercial. *See Ariix*, 2021 WL 221878, at *6 (comparing a newsletter containing investment advice, which may be considered commercial speech, with product reviews, which generally are not considered commercial speech). The commercial speech analysis

therefore turns on the third factor – whether Defendant had an economic motivation for the speech. Plaintiff argues that (1) Defendant provides commercial services to payors, and even promotes itself as "helping drive [payors'] business success," Dkt. No. 180-22, Ex. 76; (2) the class value field, in particular, is used by payors "to process reimbursements," Dkt. No. 180-23, Ex. 86; and (3) Defendant is paid an annual fee based on payors' use of the database "to pay or deny a claim," Dkt. No. 179-11, Ex. 17 at 11. *See* Dkt. No. 180 at 24–25; *see also* Hearing Tr. at 31:9–35:20. In short, Plaintiff suggests that the database is commercial speech because Defendant has an economic interest in third parties' use of the database for commercial purposes.

Plaintiff points to various witnesses who describe the significance of the class value field in payors' reimbursement determinations.[3] *See* Dkt. No. 180 at 20–28. For example, Phillip Lettrich, Defendant's "primary point of contact" for "retail pharmacies, PBMs, and payors," testified during his deposition that payors use the class value field as part of the algorithms they create in their claims adjudication systems to "determine coverage or noncoverage." *See* Dkt. No. 179-10, Ex. 16 ("Lettrich Depo.") at 14:22–26:24, 68:12–73:16. Thus, a patient may go to a retail pharmacy to purchase a product; a pharmacist can look up the patient's insurance information and the specific product in the payors' claims adjudication system; and the pharmacist can determine within seconds whether the insurance provider approves or denies coverage for that product, as well as the amount of any copayment. *See id.* at 18:5–21:13. Plaintiff also proffers evidence that payors have expressed how important the class value field is to their claims adjudication systems. One PBM, for example, confirmed that the class value field "is utilized in [its] coding logic" and that the class value field "drive[s] coverage of vitamins at point of sale." *See*, *e.g.*, Dkt. No. 179-49, Ex. 67. However, these facts only underscore that third parties—not Defendant—use the information as part of their own commercial transactions.

Plaintiff next identifies evidence that Defendant is aware that payors rely on the class value field in making coverage determinations. Defendant's Senior Vice President and Editorial

---

[3] The Court understands that Defendant argues that much of Plaintiff's proffered evidence is inadmissible hearsay. *See* Dkt. No. 189 at 6. Nevertheless, because the Court finds that this evidence, even when considered in its entirety, is insufficient to raise a material dispute of fact, the Court need not decide whether it is admissible.

Director, Patrick Lupinetti, acknowledged that he had been "told primarily by manufacturers" that payors use the class value field as a "payment screen," and that in practice "products classified as F are more likely to be paid than O." *See* Dkt. No. 179-16, Ex. 22 ("Lupinetti Depo.") at 99:7–100:17, 101:13–23. Similarly, James Breen, a First Databank clinical success department employee, testified during his deposition that he had heard from other employees that payors had "systems set up where they will allow products coded as 'F' to be reimbursed, but they will screen out products that are coded as 'O.'" *See* Dkt. No. 179-3, Ex. 2 ("Breen Depo.") at 33:7–35:22. Plaintiff also highlights that Defendant explained in a presentation to its parent company that the "Class field has become a default requirement by many payers for reimbursement of a claim; if we classify a product as an 'O' a claim for it is commonly rejected." *See* Dkt. No. 179-12, Ex. 18, at 29. But Plaintiff has failed to explain why Defendant's knowledge of how payors use the database when making reimbursement determinations somehow implicates Defendant in those transactions. Plaintiff does not suggest that Defendant is actually making these reimbursement determinations or determining what is or is not covered under a specific insurance plan. Rather, Plaintiff's evidence simply indicates that certain information in Defendant's database (*e.g.*, whether the product is labeled as prescription or over-the-counter) can drive payors' decisions.

Plaintiff further suggests that Defendant's editorial decisions in maintaining and updating the database are driven by Defendant's customers' (*i.e.*, payors') feedback, and that Defendant is compensated based on payors' use of the database. *See* Dkt. No. 180 at 23–24; Dkt. No. 179-11, Ex. 17. For example, Defendant acknowledged that it has contacted "key customers" in assessing the impact of making coding changes to the database. *See* Breen Depo. at 54:1–57:19. Defendant acknowledges that it maintains a "customer advisory panel" that is intended to "provide input and insight on potential editorial changes to First Databank." *Id.* Plaintiff further points out that Defendant is paid an annual fee based on payors' use of the database "to pay or deny a claim," Dkt. No. 179-11, Ex. 17 at 11. Although Defendant appears to dispute this interpretation, Plaintiff at least suggests that Defendant's compensation increases when a payor either pays or denies more claims in the aggregate. *See* Hearing Tr. at 13:22–14:10. But again, this merely underscores that Defendant has an incentive to provide the information that its customers require in a format that is

8

1  useful to them.  There is no question that Defendant has an incentive to sell its database and for its

2  customers to use it.  But as the Supreme Court has noted:

> If a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales.  Such a basis for regulation clearly would be incompatible with the First Amendment.

7  *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973);

8  *accord Ariix*, 2021 WL 221878, at *6 ("A simple profit motive to sell copies of a publication or to

9  obtain an incidental economic benefit, without more, does not make something commercial

10 speech.  Otherwise, virtually any newspaper, magazine, or book for sale could be considered a

11 commercial publication.").

12     The Ninth Circuit's recent opinion in *Ariix, LLC v. NutriSearch Corp.* offers an instructive

13 comparison.  2021 WL 221878, at *5–9.  In *Ariix*, a nutritional supplement company brought a

14 false advertising claim against the publisher of a nutritional supplement guide, which the

15 defendants stated was "an evidence-based book" without any "particular bias."  *See id.* at *2.  The

16 plaintiff argued that the guide was in fact "rigged" and that the defendants had an undisclosed

17 financial arrangement with one of the plaintiff's competitors, Usana, to rate Usana's supplements

18 as the best.  *Id.* at *2–3.  In analyzing whether the guide constituted commercial speech, the Ninth

19 Circuit noted that "[o]n its face, the Guide purportedly describes the science of nutritional

20 supplements and provides ratings for various nutritional supplement products," and thus "does not

21 appear to propose a commercial transaction."  *Id.* at *5.  The court then considered the *Bolger*

22 factors, specifically whether the defendant "acted primarily out of economic motivation" in

23 publishing the guide.  *See id.* at *6.  The court explained that "economic motivation is not limited

24 simply to the expectation of a direct commercial transaction with consumers," but also can

25 "involve[] indirect benefits."  *Id.* at *7.

26     In finding that the guide was commercial speech, the Ninth Circuit emphasized that its

27 decision was "a narrow one that is tied specifically to the troubling allegations in this case."  *Id.* at

28 *8.  The Ninth Circuit highlighted that according to the allegations in the complaint, the

1    defendant's CEO was paid inflated speaking fees in exchange for better reviews of Usana's
2    products; the defendant adjusted its rating criteria to favor Usana and thwart competitors from
3    receiving the guide's top rating; and the entire guide was in fact created to increase Usana's sales.
4    *Id.* at *2–3, 7. Based on these facts, the court concluded that the plaintiff had plausibly alleged
5    that the defendants "published the Guide mainly with the economic goal of furthering their own
6    self-interests beyond simply benefiting from sales of the publication" or "to inform consumers
7    about nutritional supplements." *Id.* at *7. The Ninth Circuit contrasted the "informational" aspects
8    of the guide, including "the benefits and science of nutritional supplements," with the "allegedly
9    rigged ratings of nutritional supplements," and concluded that the guide was "more like a
10   sophisticated marketing sham rather than a product review guide." *Id.* at *8–9.

11   No such facts exist here. Although Plaintiff repeatedly calls the class value field a
12   "payment screen," *see, e.g.*, Dkt. No. 180 at 1, 5, 22, Plaintiff does not allege, let alone offer facts
13   to support, that Defendant has somehow colluded with payors to establish which products will or
14   will not be reimbursed. To the contrary, Plaintiff's own evidence suggests that some payors
15   complained to Defendant that the proposed coding changes would require them to undertake
16   substantial work to change their algorithms. One PBM explained that the new "Q" code "would
17   probably not work for us," because the PBM was concerned with whether a product was
18   prescription or over-the-counter. *See* Dkt. No. 179-14, Ex. 20 at 2. The PBM further noted that
19   the coding change would require more "sophisticated programming" on the PBM's part, and said
20   that it likely would "not be the only [] client upset by this [new coding] announcement." *Id.* In
21   short, Plaintiff has not identified what direct or indirect benefit Defendant may receive for
22   changing the manner in which it codes prescription prenatal vitamins, aside from selling licenses
23   to its database.

24   Plaintiff relies heavily on *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1271–76 (9th Cir.
25   2017), and *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251,
26   264 (4th Cir. 2017), to argue that the database qualifies as commercial speech. *See* Dkt. No. 180
27   at 24, 28–30. But in *First Resort*, the speaker was a pro-life medical clinic, and the speech was
28   online "promotional advertising" to solicit "patronage of the clinic." *First Resort*, 860 F.3d at

10

1268, 1273–74. The Ninth Circuit concluded that the online advertising served the clinic's "clear economic motivation" to fundraise by attracting new clients. *Id.* at 1276. Significantly, the clinic in *First Resort* conceded that it was "advertising and participating in a competitive marketplace for commercially valuable services." *Id.* at 1274. The Ninth Circuit concluded that the case thus involved a "classic example[] of commercial speech." *Id.* But as Plaintiff has already acknowledged, this case does not. *See* Hearing Tr. at 32:5–7.

In *Handsome Brook Farm*, the defendant sent an email to grocery retailers reporting that the plaintiff, an egg producer, lacked certifications for its representations that its eggs were organic and pasture raised. *See Handsome Brook Farm*, 700 F. App'x at 252–53. The email urged the retailers to consider changing to a different egg supplier. In finding that the email constituted commercial speech, the Fourth Circuit reasoned that the defendant had an economic motive for sending the email because the defendant certified certain egg producers as "humane," and defendant received revenue from the eggs sold with its "Certified Humane" label. *Id.* at 258. Here, in contrast, Plaintiff does not argue that Defendant is paid more (or at all) based on whether a payor decides to pay or deny a claim for a specific product. The Court finds that *First Resort* and *Handsome Brook Farm* are thus inapposite.

As this Court foresaw in its order denying Plaintiff's motion for a preliminary injunction, "there is no ready limiting principle under Plaintiff's proposal: any speech could be commercial if eventually relied on by third-party actors who conduct business." *See* Dkt. No. 57 at 11. Having considered the totality of the circumstances, the Court finds that there is no genuine dispute of material fact precluding the conclusion that the database is noncommercial speech as a matter of law. Plaintiffs' Lanham Act, FAL, and UCL claims thus fail on this basis.[4]

### ii. The Database Is Not for Purpose of Influencing Consumers to Buy Defendant's Products or Services

Even if the database were considered commercial speech, Plaintiff's Lanham Act claim also independently fails because not all commercial speech is actionable under the Lanham Act.

---

[4] Because the Court finds that the database does not constitute commercial speech, it need not decide whether the coding changes are false or misleading.

11

As noted above, "[t]he Lanham Act prohibits any person from misrepresenting her or another person's goods or services in 'commercial advertising or promotion.'" *See Ariix*, 2021 WL 221878, at *4 (citing 15 U.S.C. § 1125(a)(1)(B)). Commercial advertising or promotion, in turn, is defined as: "(1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public." *Id.* (citing *Coastal Abstract*, 173 F.3d 735) (emphasis omitted).[5] Here, Defendant argues that the database was not issued "for the purpose of influencing consumers to buy *defendant's* goods or services." Dkt. No. 168 at 19–20. In response, Plaintiff suggests that this element is no longer required to find actionable "commercial advertising or promotion" under the Lanham Act. *See* Dkt. No. 180 at 29. Relying on the Supreme Court's opinion in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), Plaintiff contends that it is enough that Defendant "falsely and deceptively described [Plaintiff's] products in a manner that will cause [Plaintiff] and its customers significant harm." *See id.*

Again, the Ninth Circuit's recent opinion in *Ariix* is instructive. There, the majority ultimately remanded the case for the district court to determine in the first instance whether the nutritional supplement guide was intended to influence consumers to buy the defendants' goods. *See Ariix*, 2021 WL 221878, at *10. The court did not, however, suggest that this element was abrogated by *Lexmark*. *Cf. Ariix*, 2021 WL 221878, at *14, (Collins, J., dissenting) (finding explicitly that this "limitation also flows from the statutory language and remains valid after *Lexmark*"). Rather, in a footnote, the majority advised the district court that "it may be useful to determine whether the defendants and Usana [a nutritional supplement manufacturer] had an agency relationship." *See id.* at *10, n.10. If "the defendants were acting as agents of Usana and therefore had a vested interest in the goods that Usana sold," the majority reasoned that "might be enough to satisfy this element." *Id.* Here, there is no suggestion that the database is intended to

---

[5] Although the Ninth Circuit has not yet weighed in, *see Ariix*, 2021 WL 221878, at *9, other courts have found that the Supreme Court's opinion in *Lexmark* appears to have abrogated the "in competition" prong. *See Genus Lifesciences Inc. v. Lannett Co., Inc.*, 378 F. Supp. 3d 823, 844 (N.D. Cal. 2019) (collecting cases).

influence consumers to buy any of Defendant's own goods or services. The database does not list any of Defendant's own products or additional services. Rather, the database itself is Defendant's product.

The dissent in *Ariix* recognized that "there may be other endorsers who have such a direct financial stake in specific sales of a product—such as a cut of each sale—that it may likewise be fair to say that they are thereby *advertising* their *own* product. *Ariix*, 2021 WL 221878, at *14. But Plaintiff has not advanced such an argument. Instead, Plaintiff states broadly that Defendant is "foundational to how prescription products are marketed and sold." *See* Dkt. No. 180 at 29. Plaintiff further notes that Defendant "promotes itself on its website as an advertiser of sorts, telling manufacturers: 'You tell us. We tell the world.'" *See id.* at 29–30 (citing Dkt. No. 180-23, Ex. 77). Plaintiff thus suggests that Defendant and its database are integral to how manufacturers' products are sold. *Id.* (citing Dkt. No. 179-27, Ex. 37 at 179:2–24); *see also* Dkt. No. 179-15, Ex. 21 at ¶¶ 23, 35–63, 65–66. Yet even if this is true, it is undisputed that the products listed in the database are not Defendant's own.

And Plaintiff does not proffer any facts to suggest that Defendant has an "agency relationship" with the manufacturers or any other sort of "financial stake in specific sales of a product," such that Defendant has "a vested interest in the goods that [it] sold." *See Ariix*, 2021 WL 221878, at *10, 14, & n.10. Instead, Plaintiff acknowledges that Defendant is paid by payors and PBMs who license the database from Defendant. *See* Dkt. No. 180 at 24–25; *see also* Dkt. No. 179-11, Ex. 17 at 11. At most, Plaintiff suggests that Defendant tailors its database in the hope that payors will continue to license the database. That is not enough. *Cf. Ariix*, 2021 WL 221878, at *15 (rejecting as insufficient evidence that defendant "wrote obsequious reviews in the hope that Usana would be pleased and buy more Guides or give [the CEO] speaking engagements"). Plaintiff's Lanham Act claim thus fails as a matter of law on the independent ground that the database is not "commercial advertising or promotion" as required under 15 U.S.C. § 1125(a)(1)(B).

### B. Intentional Interference and Trade Libel

Defendant next contends that Plaintiff's intentional interference with prospective economic

advantage and trade libel claims fail because there is no evidence that Defendant acted with actual malice. *See* Dkt. No. 168 at 33–34. As the California Supreme Court has explained, "[i]n order to advance society's interest in free and open discussion on matters of public concern and to avoid undue self-censorship by the press, the First Amendment establishes a broad zone of protection" for speech, and the California Constitution "independently establishes a zone of protection that is broader still." *See Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1041 (Cal. 1986). Such protections "apply to all claims whose gravamen is the alleged injurious falsehood of a statement," regardless of the claim's label. *Id.* at 1042. Thus, here, Plaintiff has the ultimate burden of establishing by clear and convincing evidence that Defendant published a substantially false statement and acted with actual malice in doing so. *See id.* at 1042, 1047–48; *see also Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057–58 (9th Cir. 1990) (applying the actual malice standard to claims for trade libel and tortious interference with business relationships).

"Actual malice consistently has been deemed subjective in nature, provable only by evidence that the defendant 'realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.'" *See Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 511, n.30 (9th Cir. 1990) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 515 (1984)); *see also Sutter Health v. UNITE HERE*, 186 Cal. App. 4th 1193, 1210 (Cal. Ct. App. 2010) (describing "[t]he standard of actual malice [as] a daunting one" and noting that the evidence "must be of such a character as to command the unhesitating assent of every reasonable mind").

Defendant argues that both its initial proposal to reclassify Plaintiff's prenatal vitamins as "O" and its final decision to reclassify Plaintiff's prenatal vitamins as "Q" convey entirely true information. *See* Dkt. No. 168 at 33–34. Under the initial proposal, the revamped class value field, code "O," would signify "[p]roducts with no federal legal prescription requirement." *See* Dkt. No. 172-4, Ex. D; Dkt. No. 172-5, Ex. E. Defendant urges that as a dietary supplement, Plaintiff's products have "no federal legal prescription requirement." *See id.* at 26–28. And under the new coding system that Defendant instituted, Class "Q" is defined as "[p]roducts that are neither drugs nor devices." Defendant further argues that Plaintiff's products are dietary

14

supplements and not drugs under the Federal Food, Drug, and Cosmetic Act ("FDCA"). *Id.* at 25–28. Defendant contends on these bases that Plaintiff cannot establish actual malice.

In response, Plaintiff contends that Defendant acted with the required actual malice because Defendant was aware of the confusion that its coding change would cause, and Defendant's Senior Vice President and Editorial Director harbored "loath[ing]" and "distaste for prescription prenatal vitamins." *See* Dkt. No. 180 at 33–34 (citing Dkt. No. 179-25, Ex. 34 and Dkt. No. 179-26, Ex. 35). For example, Plaintiff points to an email in which Mr. Lupinetti called prescription prenatal vitamin manufacturers "mountebanks." *See* Dkt. No. 179-26, Ex. 35. Reading these statements in their entirety, however, Mr. Lupinetti appears to be questioning the veracity of these manufacturers' labels. He notes that some manufacturers "are claiming they make prescription products but are not self-identifying as manufacturers of prescription products." *See id.* He also cites concern that the FDA is not adequately regulating manufacturers' claims, and states that "prescription versions [of prenatal vitamins] can charge $3.00 a pill as opposed to two cents." *See* Dkt. No. 179-25, Ex. 34.

Even accepting Plaintiff's theory that Mr. Lupinetti and others harbored personal animus against prescription prenatal vitamin manufacturers, this does not create any genuine issue of fact as to whether Plaintiff can show clear and convincing evidence of actual malice. The actual malice standard asks whether the speaker made a false statement while knowing it was false or subjectively entertaining serious doubt as to its truth. The Court understands that Plaintiff contends the new coding system is confusing, and that it is false as to its prescription prenatal vitamins. But none of Plaintiff's evidence suggests that Defendant thought its new coding system was false generally, or false as applied to Plaintiff's products. Rather, the evidence before the Court—and indeed the very existence of this litigation—indicates that Defendant believed, and believes, that the new coding system is accurate. The actual malice standard is a demanding one, and the Court finds that there is no evidence in the record sufficient for a reasonable trier of fact to find actual malice by clear and convincing evidence. Plaintiff's intentional interference and trade libel claims thus fail.

//

## IV. CONCLUSION

Accordingly, the Court **GRANTS** Defendant's motion. The clerk is directed to enter judgment in favor of Defendant and to close the case.

**IT IS SO ORDERED.**

Dated: 2/17/2021

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge